# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

RONALD H. VAN DEN HEUVEL,
individually, and as Trustee of
The Ronald H Van Den Heuvel
Irrevocable Trust dated July 22, 2003,
KELLY YESSMAN VAN DEN HEUVEL,
Trustee of the YK Irrevocable Trust
dated November 1, 2010,
PARTNERS CONCEPTS DEVELOPMENT, INC.,
and VHC, INC.,

     Plaintiffs,

  v.            Case No. 12-C-0327

AI CREDIT CORPORATION,
FIRST INSURANCE FINANCING CORP.,
ALLIANZ LIFE INSURANCE COMPANY
OF NORTH AMERICA,
LIBBY GRANT,
JOHN HANCOCK LIFE INSURANCE COMPANY,
LIFE & LEGACY GROUP LLC,
PACIFIC LIFE INSURANCE COMPANY
PHOENIX INSURANCE COMPANY,  and
SUN LIFE ASSURANCE COMPANY OF CANADA,

    Defendants.

---

## DECISION AND ORDER GRANTING MOTIONS TO DISMISS

---

   This suit arises from an insurance premium financing scheme entered into by Plaintiff

Ronald H. Van Den Heuvel.  Van Den Heuvel filed this action *pro se* in Brown County Circuit

Court in Wisconsin.  On April 4, 2012, Defendants removed the matter from the state court.

Jurisdiction was asserted under 28 U.S.C. § 1332(a) based upon diversity of citizenship.  On

October 15, Van Den Heuvel, now represented by counsel, moved for, and on October 24, 2012,

was granted, leave to amend his complaint to add additional plaintiffs and defendants.  Currently

before the court are motions to dismiss filed by A.I. Credit Corporation, First Insurance Financing Corp., Phoenix Life Insurance Company, Pacific Life Insurance Company, and Sun Life Assurance Company.

## BACKGROUND

The facts, taken from Plaintiffs' amended complaint, are as follows. In 2005, Van Den Heuvel was engaged in the development and commercialization of a complex process for the recycling of food service waste and was seeking investors to finance further development of his inventions. Successful development of his business depended significantly on his own skill and knowledge. As a result, individually and through two trusts and two business entities, Van Den Heuvel sought insurance on his own life for the benefit of investors and his family members.

At some point prior to July 2005, Van Den Heuvel, through his insurance agent, communicated his insurance needs to Defendants Life & Legacy Group, LLC (LLG), an insurance agency, and Libby Grant, a licensed insurance producer. Thereafter, Plaintiffs were presented with a life insurance and premium financing program promoted by Defendant A.I. Credit Corporation (AICC), which would provide a total of $72 million of secure death benefit protection to Van Den Heuvel's investors and family under a series of insurance policies issued by Phoenix. (Am. Compl. ¶¶ 22-23.) The program, "Capital Maximization Strategy" (CMS), purported to offer high-net-worth individuals the opportunity to purchase very large insurance policies from one of several insurers through premium financing loans issued exclusively by AICC. (Am. Compl. ¶ 20.) LLG and Grant were authorized to market insurance products using the CMS premium financing program. (Am. Compl. ¶ 9, 20.)

Plaintiffs allege the program was a "vanishing premium" program, whereby the obligation to pay annual premiums "vanishes" over time as the surrender value of the policies increases. (Am.

2

Compl. ¶ 23.)  They contend that AICC, LLC, and Grant knew that the scheme was extremely risky, unlikely to meet the projected results, and based on unrealistic assumptions about the market. Plaintiffs further allege the program was designed to induce an insured to pour large sums of money into the program with the result that when the program does not live up to its projections, the insured is presented with the choice of walking away from its investment or "pouring good money after bad."  (Am. Compl. ¶ 23.)

Plaintiffs allege that AICC provided Van Den Heuvel with projections and illustrations showing that he would be able to effectively obtain large amounts of life insurance without depleting cash assets by borrowing funds from AICC and securing the loans in part by the insurance policies themselves.  Based on these projections, AICC represented that Plaintiffs could expect that their financed policies would become self-sustaining after payment of a limited number of annual premiums paid over five years with the loans.  (Am. Compl. ¶ 22.)  Thereafter, according to the projections, the cash values of the policies would likely exceed the amounts borrowed and Plaintiffs would no longer be required to pay premiums.  Rather, they would only have to pay interest on the borrowed sums in order to maintain the life insurance coverage.  Plaintiffs would also be required to supply collateral in the amount of the difference between the surrender value of the policies and the amount borrowed.  Plaintiffs believed that the surrender value of the policies could be expected to increase, thereby steadily reducing the collateral required.  The projections showed that after ten years, the cash value of the life insurance would likely exceed the premium debt and no non-insurance collateral would be required.  Plaintiffs agreed to the proposal in the summer of 2005 and obtained four life insurance policies from Defendant Phoenix Insurance Company (Phoenix). Plaintiff and AICC executed a Master Promissory Note on July 20, 2005.

Plaintiffs allege that the illustrations and projections provided by AICC, Phoenix, LLG, and Grant did not comply with applicable law and were materially false and misleading in several respects. (Am. Compl. ¶ 26.) For example, Plaintiffs allege that the defendants: concealed risks associated with concentrating large sums of insurance in a single insurer; provided a one-dimensional description of interest crediting rates; failed to disclose that failure to pay premiums as scheduled would result in forfeiture of large amounts of the insured's investment in the policy, loss of collateral, and trigger an immediate obligation to repay the premium loans; and failed to inform Plaintiffs that collateral requirements would increase after the first year. They also allege that Phoenix accepted Van Den Heuvel's insurance applications even though the accompanying illustrations did not comply with applicable insurance law. (Am. Compl. ¶ 27.)

In 2008, American International Group (AIG), the parent of AICC and Phoenix, experienced significant "financial reverses." As a result, AICC insisted that Plaintiffs replace three of the four policies obtained from Phoenix with policies issued by Defendant Allianz Life Insurance Company of North America (Allianz). Plaintiffs agreed, and AICC, LLG, and Grant arranged for the surrender of the Phoenix policies and their replacement by policies issued by Allianz. (Am. Compl. ¶ 30.) Plaintiffs contend that Phoenix and Allianz agreed to the surrender and reissue despite the fact that, again, the illustrations did not comply with applicable insurance law. In addition, Plaintiffs allege that in connection with the transaction, AICC, LLG, and Grant made certain misrepresentations and material omissions, including failing to disclose that the surrender and reissue would cause significant decreases in the surrender value of the policies and therefore significantly increase the likelihood that the insurance program would fail to perform as illustrated, and failing to disclose that they received commissions or compensation from Allianz for the transaction. (Am. Compl. ¶¶ 30-34.)

4

In July 2009, AIG sold AICC's portfolio of premium financing business to First Insurance Funding Corp (FIRST). Plaintiffs contend FIRST purchased the portfolio at a substantial discount, and consequently, FIRST had a "substantial incentive to manufacture a default on Plaintiff's loans and earn a quick profit by forcing the surrender of Plaintiff's policies." (Am. Compl. ¶ 35.) Shortly thereafter, FIRST refused to advance the funds necessary to pay the premium on the remaining Phoenix policy. As such, Plaintiffs failed to make a premium payment on the Phoenix policy, and on October 28, 2009, FIRST declared that Plaintiffs were in default on their loan obligations. (Am. Compl. ¶ 36.) Plaintiffs allege that FIRST also demanded that the entire insurance portfolio be transferred again, without informing Plaintiffs of the resulting commissions that would be paid to FIRST and LLG, or of the further decrease in surrender value of the policies and accompanying increase in the duration of Plaintiffs' required premium payments. (Am. Compl. ¶ 37.) Nevertheless, FIRST, LLG, and Grant arranged for the transfer of most of the insurance to Defendants Sun Life Assurance Company of Canada (Sun Life), Pacific Life Insurance Company (Pacific Life), and John Hancock Life Insurance Company (John Hancock). (Am. Compl. ¶ 38.)

FIRST also declined to fully finance the year's premium, "leaving Plaintiffs to seek to locate financing or face collapse of the insurance program." (Am. Compl. ¶ 37.) FIRST demanded that Plaintiffs begin making monthly payments for interest, although the amounts allegedly were unrelated to the actual amounts of interest accruing, and informed Plaintiffs that collateral requirements would begin to increase sharply in the future. (Am. Compl. ¶ 40.) Between 2009 and 2012, FIRST steadily increased its demands, seeking cash payments and additional collateral under the threat of foreclosure.

Plaintiffs allege that more than seven years after the program commenced, the surrender value of the policies had not increased sufficiently to make the policies self-sustaining or to fully

5

collateralize the premium loan, as Plaintiffs believed would be the case. As a result, Plaintiffs allege they have spent more than $8.8 million on premium payments, more than $2 million on interest and other borrowing costs, and forfeited collateral valued in excess of $3.5 million.

Based on these allegations, Plaintiffs have asserted four causes of action against the various lender and insurer defendants, including claims of misrepresentation and fraud against AICC, LLG, Grant, Phoenix, Pacific Life, Sun Life, and John Hancock. Plaintiffs also assert a claim for disgorgement and declaratory relief against FIFC. AICC, FIRST, Phoenix, Pacific Life, and Sun Life have filed motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), arguing the plaintiffs have failed to state a claim upon which relief can be granted as to them.

## LEGAL STANDARD

Dismissal for failure to state a claim under Rule 12(b)(6) is proper "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 558 (2007). To state a claim, a complaint must contain sufficient factual matter "that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). In addition, under the heightened federal pleading standard of Rule 9(b), a plaintiff alleging fraud must state with particularity the circumstances constituting fraud. *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 569 (7th Cir. 2012) (citing *Borsellino v. Goldman Sachs Group, Inc.*, 477 F.3d 502, 507 (7th Cir. 2007) ("This heightened pleading requirement is a response to the great harm to the reputation of a business firm or other enterprise a fraud claim can do.") (internal quotation marks omitted)). To state the circumstances with the requisite particularity, the plaintiff must allege "the who, what, when, where, and how" of the alleged fraud. *Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs., Inc.*, 536 F.3d 663, 668 (7th Cir. 2008). The purpose of the heightened pleading standard is "to force the plaintiff to do more than the usual

investigation before filing his complaint" in order to minimize the damage to reputation a baseless claim of fraud can have on a party. *Ackerman v. Northwestern Mut. Life Ins. Co.*, 172 F.3d 467, 469 (7th Cir. 1999).

In deciding a motion to dismiss, the court construes the allegations in the complaint in the light most favorable to the plaintiff, accepts all well-pleaded facts as true, and draws all inferences in favor of the non-moving party. *Estate of Davis v. Wells Fargo Bank*, 633 F.3d 529, 533 (7th Cir. 2011). In addition, district courts have discretion to consider certain documents outside the pleadings without converting the motion under Rule 12(b)(6) to a motion for summary judgment under Rule 56. *Levenstein v. Salafsky*, 164 F.3d 345, 347 (7th Cir. 1998). In particular, documents submitted with a motion to dismiss may be considered part of the pleadings if they are "referred to in the plaintiff's complaint and are central to his claim." *188 LLC v. Trinity Indus., Inc.*, 300 F.3d 730, 735 (7th Cir. 2002) (internal quotation marks omitted); *see also Brownmark Films, LC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012) ("[T]he incorporation-by-reference doctrine provides that if a plaintiff mentions a document in his complaint, the defendant may then submit the document to the court without converting the defendant's 12(b)(6) motion to a motion for summary judgment.").

## ANALYSIS

### A.    Count I:  Fraud and Misrepresentation - AICC

AICC attacks the sufficiency of the plaintiffs' complaint on numerous grounds. AICC first asserts that Plaintiffs have failed to plead their fraud and misrepresentation claim with sufficient particularity. AICC argues that Plaintiffs' fraud and misrepresentation claim also fail on the merits because AICC made no affirmative false statement of fact, and cannot be liable for any omissions

7

because it did not owe Plaintiffs a duty to disclose. In addition, AICC contends that Plaintiffs'

claims are barred by the economic loss doctrine.

Plaintiffs contend that they may satisfy Rule 9(b) by providing a "general outline" of the

circumstances constituting fraud so long as they "reasonably notify the defendant[] of [its] purported

role" in the fraud. (Opp'n Br. 4, ECF No. 92 (quoting *Midwest Grinding Co., Inc. v. Spitz*, 976 F.2d

1016, 1020 (7th Cir. 1992); *Vicom, Inc. v. Harbridge Merchant Servs., Inc.*, 20 F.3d 771, 777-78

(7th Cir. 1994).) Plaintiffs also cite two cases from other circuits for the proposition that the main

purpose of Rule 9(b) is to put defendants on notice of their misconduct. But in *Ackerman*, the

Seventh Circuit rejected this view:

> The purpose of requiring that fraud be pleaded with particularity is not, as it might
> seem and the cases still sometimes say, e.g., *Vicom, Inc. v. Harbridge Merchant
> Services, Inc.*, 20 F.3d 771, 777-78 (7th Cir. 1994) (which refers, however, to the
> skeptical literature, id. at 777 n. 4), to give the defendant in such a case enough
> information to prepare his defense. A charge of fraud is no more opaque than any
> other charge. The defendant can get all the information he needs to meet it by filing
> a contention interrogatory.

172 F.3d at 469. Rather, the purpose of the heightened pleading requirement in fraud cases is to

require plaintiffs "to conduct a precomplaint investigation in sufficient depth to assure that the

charge of fraud is responsible and supported, rather than defamatory and extortionate." *Id.* Thus,

plaintiffs must describe the "the who, what, when, where, and how" of the alleged fraud. *DiLeo v.

Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990). "[T]he reference to 'circumstances' in [Rule

9(b)] is to matters such as the time, place, and contents of the false representations or omissions, as

well as the identity of the person making the misrepresentation or failing to make a complete

disclosure and what that defendant obtained thereby." 5A Wright & Miller, Fed. Prac. & Proc. Civ.

§ 1297 (3d ed. 2005); *accord Windy City*, 536 F.3d at 668.

8

Here, Plaintiffs fail to allege with sufficient specificity the circumstances constituting AICC's fraudulent conduct. While Plaintiffs set forth in some detail the "offer" they received to participate in the CMS premium financing scheme and how their investments subsequently went bad, they do not sufficiently tie the consequences to the actor causing them. Plaintiffs identify AICC as one culprit, but they do not explain how, when, or where AICC committed the acts or omissions that would subject them to liability. To the extent Plaintiffs allege that AICC's misrepresentations came in the form of failing to disclose material information, Plaintiffs still fail to allege the circumstances under which AICC should have disclosed the information. *See Wigod*, 673 F.3d at 571. For example, Plaintiffs have provided no indication as to when or how many times they met with or communicated with AICC, the means by which they communicated, who was involved in the communications, what was discussed, or why AICC should have provided information that they failed to disclose. It is not even clear that any of the plaintiffs ever directly communicated with AICC. It appears that Plaintiffs were communicating with AICC through their own insurance agent, and the details regarding how the "offer" was communicated, from where it originated (from AICC, from Phoenix, from Plaintiffs' insurance agent, or another entity), or to whom it was communicated are murky at best. Likewise, Plaintiffs repeatedly lump AICC together with the insurance intermediaries and insurers and refer to the misleading "illustrations" without explaining what information was obtained directly from AICC, who prepared the illustrations, or when they were provided.

Plaintiffs must do more than explain that they have been wronged by a bad investment and accuse AICC as the party that is responsible. *See Ackerman*, 172 F.3d at 471 ("The plaintiffs were required to specify which defendants said what to whom and when, unless they could show, which they did not attempt to do, that the requisite information was "within the defendant's exclusive

9

knowledge.'") (quoting *Jepson, Inc. v. Makita Corp.*, 34 F.3d 1321, 1328 (7th Cir. 1994)). If indeed AICC engaged in a series of misrepresentations in order to profit from Plaintiffs' misunderstanding of the loan terms or the premium financing scheme in general, then Plaintiffs must do more to explain how this is so. Rather, as stated, their complaint sets up what will surely be a fishing expedition during discovery, and offers a blanket accusation without stating with any particularity the basis for it.

Plaintiffs also make an unpersuasive attempt to claim they are not necessarily pleading intentional misrepresentation, and that they therefore need not comply with the heightened pleading requirements of Rule 9(b). However, the complaint plainly alleges intentionally fraudulent actions and therefore "sounds in fraud." *See Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 446 (7th Cir. 2011) (denying a similar "proposed end run around the complaint's particularity problems" because "the practices alleged in [the] complaint constitute fraudulent activity, and the dictates of Rule 9(b) apply to allegations of fraud, not claims of fraud"). Regardless of how Plaintiffs now attempt to obscure the nature of their claims, complaints that allege intentional misrepresentation–as Plaintiffs have done here with their assertions that the various defendants knowingly supplied them with false and misleading information–must be stated with particularity in order to ensure fraud is not "charged irresponsibly by people who have suffered a loss and want to find someone to blame for it." *Ackerman*, 172 F.3d at 469.

In any case, AICC also attacks Plaintiffs' claims on the merits. Plaintiffs' fraud allegations center on AICC's knowing failure to disclose certain information in an effort to induce the plaintiffs to enter into and continue to invest in the CMS insurance and premium finance loan program. AICC argues Plaintiffs cannot prevail because the complaint neither identifies an affirmative misrepresentation made by AICC, nor does it allege a fraudulent omission of facts that AICC had

10

a duty to disclose. In the alternative, AICC contends that even if there were misrepresentations or omissions, they were interwoven with the terms of the contract formed between AICC and Plaintiffs such that Plaintiffs' claims are barred by the economic loss doctrine.

Wisconsin law recognizes three different torts of misrepresentation: intentional, negligent, and strict responsibility. *Ollerman v. O'Rourke Co., Inc.*, 94 Wis. 2d 17, 24, 288 N.W.2d 95, 99 (Wis. 1980). Each of these theories of liability requires showing: (1) the defendant made a factual representation that was untrue; (2) the plaintiff believed the statement to be true; and (3) the plaintiff relied on it to his or her detriment. *Id.* To prevail on a claim of intentional misrepresentation, the plaintiff must additionally establish that the defendant made the misrepresentation either knowing it was untrue or without regard for its truth or falsity, and that the defendant intended to defraud and to induce another to act upon the misrepresentation. *Kaloti Enterprises, Inc. v. Kellogg Sales Co.*, 2005 WI 111, ¶ 12, 283 Wis. 2d 555, 699, N.W.2d 205. Under a strict responsibility theory, intent to deceive is immaterial, but the defendant must have an economic interest in the transaction, and the misrepresentation must be made on the defendant's personal knowledge or under circumstances in which he necessarily ought to have known the truth or untruth of the false statement. *Ollerman*, 94 Wis. 2d at 25, 288 N.W.2d at 99. Finally, under a negligent misrepresentation theory, a plaintiff must show the defendant owed a duty of care to the plaintiff and failed to exercise ordinary care in making the misrepresentation or in ascertaining the facts. *Id.*

Plaintiffs do not specify under which misrepresentation theory they are proceeding, but AICC contends that Plaintiffs' claims fail regardless of the theory because each requires a plaintiff to allege the defendant made a false representation of fact, and Plaintiffs have failed to do so here. Indeed, Plaintiffs concede that they have not alleged that AICC made any affirmative misrepresentations of fact. Instead, they contend that AICC's liability arises from its omission or concealment of certain

11

information, which misled Plaintiffs.  Generally, there is no duty to disclose all facts known to a party in an arm's-length transaction.  *Ollerman*, 94 Wis. 2d at 28; 288 N.W.2d at 101 (explaining that parties to a business transaction must "use their faculties and exercise ordinary business sense, and not . . . call on the law to stand *in loco parentis* to protect them in their ordinary dealings with other business people").  However, "courts have carved out a number of exceptions to that rule and have refused to apply the rule when to do so would work an injustice." *Kaloti*, 2005 WI 111 at ¶ 14. Whether a party has a legal duty to disclose is a question of law.  *In Matter of Estate of Lecic*, 104 Wis. 2d 592, 605, 312 N.W.2d 773, 779 (Wis. 1981).

A duty to disclose a fact may arise where:  (1) the fact is material to the transaction; (2) the party with knowledge of that fact knows that the other party is about to enter into the transaction under a mistake as to the fact; (3) the fact is peculiarly and exclusively within the knowledge of one party, and the mistaken party could not reasonably be expected to discover it; and (4) on account of the objective circumstances, the mistaken party would reasonably expect disclosure of the fact. *Kaloti*, 2005 WI 111 at ¶ 20; *see also* Restatement (Second) of Torts § 551 cmt. L (1977) (suggesting that a duty will only be found where "the advantage taken of the plaintiff's ignorance is so shocking to the ethical sense of the community, and is so extreme and unfair, as to amount to a form of swindling, in which the plaintiff is led by appearances into a bargain that is a trap, of whose essence and substance he is unaware").  Courts must balance "the general requirement that each party to a transaction must diligently protect its own self-interest" with an "interest in formulating business judgments without being intentionally misled by others." *Kaloti*, 2005 WI 111 at ¶ 24.

AICC argues that it had no duty to disclose the risks Plaintiffs complain were attendant to the CMS premium financing program.  AICC also argues that most of the alleged omissions for

which Plaintiffs attempt to hold AICC responsible relate to the likely performance of the insurance policies, not the premium finance loans. But this distorts Plaintiffs' allegations. Plaintiffs contend that AICC made sales presentations and provided illustrations and projections regarding the insurance policies' performance in order to convince them to enter into a scheme to finance the premiums required to sustain the policies. The insurance policies were connected to the financing arrangement, and the alleged statements made by AICC about the benefits of the premium financing program were predicated on the benefits of the insurance policies.

Regardless, AICC also argues that the express disclaimers in the Master Promissory Note and the Amended and Restated Master Promissory Note governing the relationship between Plaintiffs and AICC explicitly contemplate that any risk associated with Plaintiffs' investment plan would be allocated exclusively to the plaintiffs. The Notes contain language stating that the borrower "agrees to, at its sole cost and expense, maintain the Insurance Policy that secures this Note" and "shall indemnify and hold harmless Lender for any losses . . . including without limitation, any losses relating to the inability of the customer to replace life insurance due to age, health, or any other reason." (AICC Br. in Support of Motion to Dismiss, Ex. A at 4, 6, ECF No. 72-1; *Id.*, Ex. B 5, 9, ECF No. 72-2.) The Notes also warn, among other things, that "Lender has not and will not provide any advice or recommendations in connection with the loans, including but not limited to advice or recommendations relating to estate or financial planning, tax or accounting or legal matters" and that "neither the insurance agent/broker nor the insurance company is Lender's agent and neither can legally bind Lender in any way or make any commitment on Lender's behalf." (*Id.*, Ex. A at 7-8, Ex. B at 11-12.) Likewise, in signing the Notes, Van Den Heuvel acknowledged that he had been represented by his "own competent counsel in connection with this loan." (*Id.*, Ex. A at 7, Ex. B at 11.)

Plaintiffs have alleged some of the elements necessary to establish that AICC had a duty to disclose. They allege that AICC's omissions were material to the transaction and that AICC intentionally withheld the information knowing that Plaintiffs were agreeing to the CMS premium financing program under a mistaken understanding of the risks involved. But, the complaint offers no indication that Plaintiffs could not reasonably be expected to discover the information AICC allegedly failed to disclose. Plaintiffs entered at arm's length into a complex, sophisticated transaction in which they were represented by their own insurance agent and their own attorney, and the deal was memorialized in a detailed contract laying out their responsibilities. Under the circumstances, AICC contends that it would be unreasonable to impose on it the broad duty to disclose Plaintiffs argue for, as borrowers such as Plaintiffs are well-equipped to make estate and business plans and investment choices themselves. Indeed, despite Plaintiffs' allegations regarding AICC's responsibility for the poor outcomes in the performance of the insurance policies, the Plaintiffs have no basis for establishing AICC owed a duty to educate Plaintiffs about insurance policies or about all risks associated with the financing agreement. Moreover, Plaintiffs chose to enter the agreement in the face of disclaimers and clear contract language acknowledging that they were entering into the premium financing agreement at their own risk. They cannot blame AICC because in hindsight, they believe they made a poor investment. *See Gries v. First Wisconsin Nat. Bank of Milwaukee*, 82 Wis. 2d 774, 780, 264 N.W.2d 254, 257 (Wis. 1978) ("Although the failure of the business is unfortunate for both the plaintiffs and the bank, it was a risk which the plaintiffs assumed, and which can not be shifted to the bank.")

Nevertheless, in some cases, even in arm's length transactions involving commercial entities, there will be a duty to disclose. For example, in *Kaloti*, the Wisconsin Supreme Court found the plaintiff had alleged facts sufficient to establish the defendants had a duty to disclose such that the

14

complaint survived a motion to dismiss. 2005 WI 111 at ¶ 26. There, the plaintiff, a secondary supplier, had regularly bought the defendants' products. It would then resell the products to large-market stores. *Id.* at ¶ 22. After a number of years, the defendants decided to begin selling their products directly to the same large-market stores. However, they also continued to sell the same product to the plaintiff, fully aware that the plaintiff would effectively be unable to resell the products to its customary market. *Id.* The defendants also knew that the plaintiff had no idea that the defendants had changed their sales strategies. *Id.* The court emphasized its narrow holding, and found significant the fact that the parties had an ongoing, established practice of doing business, and therefore, it was reasonable for the plaintiff to expect the defendants to disclose the fact that they now intended to sell the same products directly to the same stores to which the plaintiff had customarily sold. *Id.* at ¶¶ 22-24.

But here, there is nothing to suggest that the plaintiffs acted reasonably in expecting that AICC had a duty to disclose, or even that the facts not disclosed were in the exclusive knowledge of AICC. Moreover, unlike *Kaloti*, the omitted facts are amorphous and described in broad strokes–the contours of the alleged misrepresentation are not clear, nor is it clear how far the plaintiffs believe the duty to disclose stretches. Plaintiffs are an individual, two corporations, and two trusts. The individual plaintiff, Ronald Van den Heuvel, was engaged in the development and commercialization of his business. Individually and through his various legal entities and his own insurance agent and attorney, he sought a sophisticated investment scheme. With the help of his own insurance agent and attorney, he subsequently agreed to purchase more than $70 million in life insurance coverage. Plaintiffs supply no reason in law or policy to impose on AICC a broad duty to fully disclose all risks associated with a complex investment plan, particularly where it is apparent many of the supposedly withheld facts were available to the plaintiffs had they investigated them.

15

What is more, some of Plaintiffs' allegations are meritless in light of the clear language of the parties' contract. For example, Plaintiffs allege that AICC did not disclose that failure to pay premiums as scheduled would result in "forfeiture of all or much of the insured's investment in the policy and cause loss of collateral and trigger an immediate obligation to repay the premium loans" as well as causing "the insurance provided [to] lapse and fail to accomplish the stated purposes of the program." (Am. Compl. ¶¶ 26, 53.) Yet, the Notes plainly provide that Plaintiffs' obligations would be accelerated in the event of a default, including "Borrower's failure to make any payment when due, . . . or Borrower's failure to pay or cause to be paid, on the dates specified in the signed policy illustration, any Insurance Policy premiums necessary to maintain the death benefit and cash surrender values in the amount and frequency as illustrated." (AICC Br. in Support of Motion to Dismiss, Ex. A at 4-5, ECF No. 72-1; *Id.*, Ex. B at 7-8, ECF No. 72-2.) The Notes further provide that in the event of a default, AICC may "accelerate the maturity of this loan, declare all principal, interest and other charges payable hereunder immediately due and payable and seek any and all other remedies available . . ." including cancel the Insurance Policy and foreclose on Plaintiffs' collateral. (*Id.* at 5.)

Likewise, the "distortions" Plaintiffs complain of include allegations that AICC knew that the crediting rate which its illustrations assumed were "significantly higher" than the rates actually likely to apply, that the rates were not guaranteed by the insurers, and that AICC did not include alternative projections showing the effect of lower or higher rates. But projections are, by their very nature, based on assumptions as to likely outcomes. They are estimates, not guarantees. Plaintiffs do not explain how providing perhaps unrealistically positive projections constitutes an actionable misrepresentation. Nor do they explain why AICC's failure to provide alternative projections subjects them to liability. Plaintiffs do not allege or provide any basis for inferring that AICC

16

skewed or distorted the numbers in its illustrations and projections, or even that they hid certain obvious risks. To the contrary, Plaintiffs' allegations against AICC boil down to complaints regarding the consequences that ensued from their failure to pay premiums, and complaints regarding their reliance on assumed, non-guaranteed credit rates not dropping. These were consequences that Plaintiffs should have been aware of given the plain terms of their lending agreement. Rather, Plaintiffs appear to be under the mistaken belief that AICC should have guaranteed the "success" of their program–a position not supported by the parties' contract nor by any applicable law.

In the absence of any plausible allegations that would give rise to a duty to disclose the information Plaintiffs allege was withheld, AICC cannot be liable under any misrepresentation theory. Accordingly, it is unnecessary to separately discuss AICC's arguments regarding the economic loss doctrine. Based on the foregoing, AICC's motion to dismiss will be granted.

### B. Count IV: Fraud and Misrepresentation - Insurers

The plaintiffs also assert that each of the insurance company defendants, including Phoenix, Sun Life, and Pacific Life, had a duty to assure themselves that the proposed insurance was suitable for the prospective insured and that the policy summaries, illustrations, and other solicitation of the insurance complied with Wisconsin insurance regulations and were neither deceptive nor misleading. (Am. Compl. ¶ 82.) Plaintiffs allege that each of the insurers knew that the information provided to Plaintiffs by AICC, LLG, and Grant did not meet these standards. (Am. Compl. ¶ 83.) Plaintiffs claim that the insurer defendants knew that the CMS presentation systematically understated the need for payment of insurance premium and provision of collateral, failed to disclose the impact of varying investment yields and premium financing rates on the ability of the solicited program to accomplish the insured's objectives, and failed to disclose the additional commission and

17

other benefits being received by LLG and Grant. (Am. Compl. ¶ 83.) Phoenix, Sun Life, and Pacific Life have filed motions to dismiss, and all argue that Plaintiffs' allegations fail to adequately set forth the circumstances constituting fraud, as required by Rule 9(b).

To begin with, Plaintiffs' complaint is confusing and at times inconsistent due to the vague nature by which it lumps the insurer defendants together. For example, Plaintiffs allege that Phoenix was implicated in offering the proposed CMS premium financing model, but it is unclear what role Phoenix played in the process. (Am. Compl. ¶ 22, 25.) The Phoenix policies were apparently solicited in 2003–well before the proposed CMS "program of insurance and premium finance" was offered by AICC, LLG, and Grant. (Am. Compl. ¶¶ 22-23.) Plaintiffs provide no dates as to when the Phoenix policies were actually sold, but "at the time the Phoenix policies were placed," LLG had not even been formed yet, and Grant was a school teacher, not an insurance broker. (Opp'n Br. 17-18, n.4, ECF No. 92.) Yet the complaint lumps Phoenix in with the other insurer defendants, alleging Phoenix allowed AICC, LLG, and Grant to solicit the sale of its life insurance using projections created by the CMS model. (Am. Compl. ¶ 81.)

In general, Plaintiffs' complaint does not identify with clarity or consistency which particular defendants participated in which parts of the alleged scheme. Rather, Plaintiffs generally allege that the various insurer defendants should have provided information alerting Plaintiffs of the supposedly "false and misleading" nature of the illustrations and projections provided by AICC, LLG, and Grant. (*See* Am. Compl. ¶¶ 26-27, 32, 39, 82-83.) The complaint alleges that the insurers each "either received or had a right to receive each and every item of marketing material provided by LLG and Grant to the insured in the course of their solicitation of insurance" and that the insurers had actual knowledge of the terms of the CMS projections and agreed to "allow AICC, LLG, and Grant to solicit the sale of their life insurance" using the projections. (Am. Compl. ¶¶ 80-81.) However,

18

Plaintiffs do not indicate where, when, how, or why the insurers became involved with AICC, LLG, and Grant such that the insurers allowed them to solicit the sale of insurance based on the CMS projections. Nor do they indicate where, when, how, or why the insurers had access to "each and every" item of marketing material. What is more, the complaint confusingly concludes its cause of action against the insurers by claiming Plaintiffs have sustained damages "[a]s a result of the misrepresentations and failures of disclosure of *AICC*." (Am. Compl. ¶ 84 (emphasis added).) Likewise Plaintiffs' allegation that they should have been told that similar investment schemes had proven unsuccessful is not enough to make Plaintiffs' claims plausible. Nowhere do Plaintiffs contend that any of the insurer defendants made representations to them concerning the type of investments they would make on Plaintiffs' behalf, the experience or knowledge of the defendants, or the limited nature of any exposure to risk

More importantly, Plaintiffs refer generally to insurer defendants who were involved in the alleged scheme at different times. Plaintiffs were communicating with Phoenix as early as 2003. By 2009, Allianz came into the picture. Meanwhile, there is no indication Plaintiffs had any contact with Sun Life, Pacific Life, or John Hancock until sometime during or after 2009. Yet, Plaintiffs generically group the insurers and allege that the actionable misrepresentation stems from the false and misleading illustrations and projections offered by AICC, LLG, and Grant–actions that must have taken place before 2009, when AICC's loan portfolio was transferred to FIRST. Plaintiffs do not explain how Sun Life and Pacific Life had any role in inducing Plaintiffs to agree to the premium financing scheme entered into in 2005. The Sun Life and Pacific Life policies were apparently not purchased until some time in 2010 when FIRST, LLG, and Grant arranged for the transfer of "most of the insurance" presumably from Allianz to Sun Life, Pacific Life, and John Hancock. Yet without explanation, Plaintiffs apparently seek to recover from Sun Life and Pacific Life for purported

19

misrepresentations made in 2005 (or possibly 2003) by AICC, Phoenix, LLG, and Grant. Because they do not distinguish between the various insurer defendants, Plaintiffs also seek to recover from Sun Life and Pacific Life for the insurance policy surrender and replacement occurring between Phoenix and Allianz in 2009. At most, Plaintiffs allege that Sun Life and Pacific Life accepted insurance application forms, issued policies, and received premiums–but to the extent that these insurers played a role in a fraudulently-induced premium financing scheme, Plaintiffs fail to allege the terms, dates, or means by which Sun Life or Pacific Life are connected.

As a general matter, the complaint is vague as to the timing of the alleged events. For instance, the complaint alleges in various places that "sales presentations" were misleading or otherwise failed to comply with applicable insurance regulations, yet Plaintiffs provide no indication of when these supposed sales presentations took place, nor do they indicate who was present or what particulars were presented or discussed. From what appears on the face of the complaint, there was a single sales presentation some time in 2005 in which perhaps AICC, LLG, Grant, and Phoenix were involved. Plaintiffs also do not indicate when the surrender of the Phoenix policies and reissue to Allianz occurred. Nor do they state when the policies were later transferred to Sun Life or Pacific Life.

The effect of these shortcomings is that Plaintiffs' labyrinthine and confusing allegations are inadequate to comply with the requirements of Rule 9(b). *See Stephenson v. Hartford Life & Annuity Ins. Co.*, 2003 WL 22232968, at *7 (N.D. Ill. Sept. 26, 2003) ("Although there is no mystery as to the nature of the allegations, plaintiffs' failure to specifically plead the date, place, method, speaker or recipient of the alleged misrepresentations leave defendants with far too much guess-work."). In pleading fraud, Plaintiffs must "reasonably notify the defendants of their purported role in the scheme." *Vicom*, 20 F.3d at 778 (internal quotations omitted). In a case involving

multiple defendants, this means the complaint must inform each defendant of the nature the particular actions constituting their alleged participation in the fraud. *Ackerman*, 172 F.3d at 471 (finding inadequate a complaint that alleged "in general terms that the defendants inspired, encouraged, and condoned" the allegedly misleading insurance sales pitch, but failed to associate a particular defendant with the particular set of misleading statements, nor did it specify the contents of the statements). "The grounds for the plaintiff's suspicions must make the allegations plausible, even as courts remain sensitive to information asymmetries that may prevent a plaintiff from offering more detail." *Pirelli*, 631 F.3d at 441-43 (explaining that Rule 9(b) is "designed to discourage a 'sue first, ask questions later' philosophy"). Plaintiffs have failed to meet the dictates of Rule 9(b) here.

Aside from the deficiencies in the form of the pleadings, Plaintiffs' claims as to the insurers are likewise substantively lacking. Plaintiffs allege that the insurers agreed to allow AICC, LLG, and Grant to solicit the sale of their life insurance using the misleading projections, but this bald allegation is insufficient to establish an agency relationship such that the insurers can be liable for the representations or omissions made by LLG and Grant. Generally, insurance intermediaries solicit or negotiate insurance on behalf of either an insurer or an insured. *See* Wis. Stat. § 628.02. In contrast to an insurance agent, who is employed by and represents an insurer, an intermediary is an insurance broker if he or she acts as a middleman on behalf of the insured. *Id.*; *Prod. Credit Ass'n of Se. Wisconsin v. Gorton Farms*, 216 Wis. 2d 1, 8, 573 N.W.2d 549, 553 (Ct. App. 1997). An insurance broker assumes the duties of an agent to the insured, and does not act on behalf of the insurer except by collecting premiums or performing other ministerial acts. Wis. Stat. § 628.02. From what appears on the face of Plaintiffs' complaint, LLG and Grant were acting as brokers on Plaintiffs' behalf. There are no facts from which it can be inferred that they were employed by any of the insurer defendants or had the authority to enter into contracts on their behalf. Rather,

21

according to Plaintiffs, LLG and Grant submitted applications and procured policies on Plaintiffs' behalf from the various insurers in furtherance of the CMS premium finance scheme. Because Plaintiffs' allegations regarding the insurers are predicated on the actions of LLG and Grant, their claims fail as a matter of law because LLG and Grant were not agents of any of the insurers when any of the alleged misrepresentations were made–and in the case of Phoenix, LLG and Grant apparently had nothing whatsoever to do with the procuring of the Phoenix policies.

But even so, absent special circumstances, an insurer and its agents owe limited duties to the insured. *Sprangers v. Greatway Ins. Co.*, 182 Wis. 2d 521, 547, 514 N.W.2d 1, 11 (Wis. 1994); *Nelson v. Davidson*, 155 Wis. 2d 674, 682, 456 N.W.2d 343, 346 (Wis. 1990). For example, insurers do not have an affirmative duty to advise the insured regarding the availability or adequacy of coverage. *Nelson*, 155 Wis. 2d at 682, 456 N.W.2d at 346. Only where a statutory obligation or a special relationship exists will a duty arise. *Id.* "Special circumstances exist when something more than a standard insured-insurer relationship exists, such as an express agreement that an agent will advise the insured about his or her coverage." *Avery v. Diedrich*, 2007 WI 80, 301 Wis. 2d 693, 706, 734 N.W.2d 159, 165. Other circumstances giving rise to a duty to advise include situations in which an insured pays an insurance agent compensation for his or her advice, where an insured has a long-established relationship and has entrusted an agent such that the agent appreciates that he or she has an enhanced duty of providing advice, or the insured relies on advice after an agent held himself or herself out as a highly skilled insurance expert. *Id.* Imposing an affirmative duty to advise would remove any burden from the insured to take care of his or her own needs and expectations, hamper the competitive marketplace, or subject insurers to "liability for failing to advise their own clients of every possible insurance option, or even an arguably better package of insurance offered by a competitor." *Nelson*, 155 Wis. 2d at 682, 456 N.W.2d at 346.

Perhaps with these principles in mind, Plaintiffs attempt to support their claims against the insurers by citing to certain Wisconsin statutes and regulations which they contend support their allegations and prevent dismissal at this stage. Plaintiffs assert that they do not have a duty to plead legal theories, but that they have "set out the circumstances from which a duty of disclosure would plainly arise." (Opp'n Br. 8, ECF No. 92.) Plaintiffs assert that "Wisconsin has many laws and regulations governing the obligations of life insurers and life insurance agents" including Wis. Stat. § 628.34 and Ins. §§ 2.07, 2.14, 2.16(6), and 2.17, and that these laws and regulations constitute part of the "customs of the trade" which should have alerted the insurer defendants to the fact that Plaintiffs would reasonably expect disclosure of complete information about the insurance policies. (Opp'n Br. 9, ECF No. 92.)

But even if Plaintiffs need not plead legal theories, a complaint which complies with the relevant pleading standard is not necessarily immune from a motion to dismiss. *See Kirksey v. R.J. Reynolds Tobacco Co.*, 168 F.3d 1039, 1041 (7th Cir. 1999). Plaintiffs do not further elaborate how these insurance laws and regulations apply here or why they support Plaintiffs' claims, and the court is not required to do a party's research for it. *Cnty. of McHenry v. Ins. Co. of the West*, 438 F.3d 813, 818 (7th Cir. 2006) ("When presented with a motion to dismiss, the non-moving party must proffer some legal basis to support his cause of action. Although the district court is required to consider whether a plaintiff could prevail under any legal theory or set of facts, it will not invent legal arguments for litigants, and is not obliged to accept as true legal conclusions or unsupported conclusions of fact.") (internal quotations omitted). Plaintiffs' allegations that the insurers owed Plaintiffs a statutory duty to disclose certain risks or other information related either to the insurance policies or to the premium financing scheme cannot be supported by their vague references to "applicable law and regulation" as Plaintiffs assert in their opposition brief and in their complaint.

23

Finally, with regard to Phoenix specifically, Plaintiffs allege that Phoenix participated in the CMS premium financing proposal and sales presentation, and that Phoenix's policy illustrations and projections were materially false and misleading. (*See* Am. Compl. ¶¶ 25-27.) Phoenix argues that the language of the illustrations plainly indicates otherwise. As an initial matter, Plaintiffs contend the illustrations should not be considered as part of a motion to dismiss. While generally, a court must limit its review to the allegations of the complaint in deciding a Rule 12(b)(6) motion to dismiss, an exception exists for documents that are referred to in the complaint and that are central to the plaintiff's claim. *Hecker v. Deere & Co.*, 556 F.3d 575, 582 (7th Cir. 2009). If the plaintiff fails to attach such documents to the complaint, the defendant may submit them in support of his Rule 12(b)(6) motion to dismiss. *Tierney v. Vahle*, 304 F.3d 734, 738 (7th Cir. 2002). And where the authenticity of such a document is undisputed, "[t]he court is not bound to accept the pleader's allegations as to the effect of the exhibit, but can independently examine the document and form its own conclusions as to the proper construction and meaning to be given the material." 5 Wright & Miller, Federal Practice & Procedure: Civil 2d, § 1327 at 766 (1990); *Rosenblum v. Travelbyus.com Ltd.*, 299 F.3d 657, 661 (7th Cir. 2002). Here, the illustrations are specifically referred to in the complaint and form the basis for Plaintiffs' claims of fraud against Phoenix; therefore, they are properly considered. Additionally, Plaintiffs question the authenticity of the illustrations Phoenix relies on, in part, because they are addressed to "Valued Client" and not to Ronald Van Den Heuvel. However, this argument merits little attention given the illustrations bear Van Den Heuvel's signature, and although addressed to "Valued Client," they include identifying information specific to Van Den Heuvel. In any case, the illustrations were authenticated as proper business records in an affidavit submitted by Phoenix. (Juhasz Aff. 1-2, ECF No. 62.)

24

A consideration of the Phoenix policy illustrations further supports the conclusion that Plaintiffs' claims against Phoenix cannot proceed. The policy illustrations provided overviews of the projected values of the policies, including projected surrender values and death benefit values based on a scheduled premium outlay plan. The values, in turn, assumed certain non-guaranteed elements, including credited interest rates, cost of insurance charges and expense charges. Thus, to the extent that Plaintiffs have alleged that the illustrations should have disclosed the impact of investment yield shortfalls or included different interest crediting rates, their claims are barred by the language of the illustrations, which Van Den Heuvel signed. In signing, he acknowledged that he understood that "any non-guaranteed elements illustrated are subject to change and that actual results could be more or less favorable than those shown. The Sales Representative has told me that they are not guaranteed." (Juhasz Aff., Ex. 1 at 5, ECF No. 62-1.)

As explained, the illustrations offered projections only, and explained that the projections assumed a continuation of an existing state of affairs which "is not likely to occur and actual results may be more or less favorable than those illustrated." (Juhasz Aff., Ex. 1 at 1, ECF No. 62-1.) The illustrations' disclaimers to this effect were not provided in the fine print. Rather, they are the first item stated on page one of each illustration. The illustrations also state that the "[v]alues shown in this illustration may not reflect your actual tax or accounting consequences. Consult professional advisors for interpretation." (Juhasz Aff., Ex. 1 at 1, ECF No. 62-1.)

Based on the foregoing, Plaintiffs' allegations against Phoenix, Sun Life, and Pacific Life are insufficient to state a claim that entitles them to relief. Therefore, it is unnecessary to separately consider Phoenix's arguments regarding the application of the statute of limitations or the economic loss doctrine.

### C. Count III: Disgorgement and Declaratory Relief - FIRST

Plaintiffs' claim against FIRST sounds in contract. Plaintiffs seek a declaration that FIRST did not have the right to declare their loan in default, to take possession of the collateral securing it, or to collect on any purported deficiency. Plaintiffs seek to recover from FIRST the proceeds of the surrender of the insurance policies and foreclosure on their collateral. They claim that if "the conduct alleged against AICC means that AICC could not have foreclosed Plaintiffs' interest, then [FIRST] cannot either, and ought to return what it obtained by doing so." (Opp'n Br. 2, ECF No. 92.) This is a non sequitor. Plaintiffs offer no theory as to why the alleged fraud by AICC should bar FIRST from pursuing its remedies under its contract. Plaintiffs have not sought rescission of the contract, nor would it seem they have grounds to seek such relief. Moreover, as described herein, Plaintiffs have not stated a claim against AICC, and therefore, its cause of action against FIRST necessarily fails even on their terms. In any case, Plaintiffs' claim is barred by the plain language of the Master Promissory Note, which defines the rights and obligations of the plaintiffs and FIRST.

The FIRST Master Note unambiguously establishes that it was meant to supersede or substitute for the AICC Notes discussed above. The FIRST Master Note states that Van Den Heuvel and FIRST "desire to roll the outstanding principal balance of the Original Note into this . . . [Master Note] and intend that the terms of the Loan be governed solely by this . . . [Master Note]." (Sawko Decl., Ex. A at 1, ECF No. 11-2.) Plaintiffs have not alleged any fraudulent conduct on the part of FIRST in connection with the execution of the Master Note, and they do not seek to rescind it. Therefore, they have failed to plead any basis to assert that FIRST does not have the right to exercise its rights under the Master Note, and the unambiguous terms of the Note must be enforced as written. The Master Note plainly provides that FIRST had the right to declare a default and foreclose on the collateral. The Note also contains a disclaimer that provides:

26

> LENDER SHALL NOT BE REQUIRED TO EXTEND ANY AMOUNTS DUE HEREUNDER (OTHER THAN THE ORIGINAL PRINCIPAL AMOUNT HEREOF) TO BORROWER OR ANY OTHER ENTITY, INCLUDING BUT NOT LIMITED TO ANY ADDITIONAL AMOUNTS NECESSARY TO FUND PREMIUMS DUE IN RESPECT OF THE INSURANCE POLICY.

(Sawko Decl., Ex. A at 11, ECF No. 11-2.)  The FIRST Master Note also provided that neither the insurance agents, insurance brokers, nor insurance companies were FIRST's agents.  Likewise, Van Den Heuvel agreed that the FIRST Master Note constituted a loan and not an insurance transaction and was separate and distinct from any issuance of an insurance policy; likewise, FIRST was in no way involved in the sale, structuring or issuance of the insurance policy.  Finally, the Note provided that

> BORROWER WILL BE HELD RESPONSIBLE FOR, AND THE BORROWER AGREES TO SATISFY, ALL FINANCIAL OBLIGATIONS UNDER THE TERMS OF THE LOAN DOCUMENTS REGARDLESS OF ANY FUTURE DECISION BY BORROWER OR ANY OTHER PARTY TO CONTEST, CHALLENGE, UNWIND, OR RESCIND THE FINANCED INSURANCE POLICY OR THE ISSUANCE THEREOF.

(*Id.* (emphasis in original).)  Because FIRST did not wrongfully retain any profits, Plaintiffs are not entitled to disgorgement as an equitable remedy.   As such, the claims against FIRST must be dismissed.

## CONCLUSION

Based on the foregoing, the motions to dismiss filed by Defendants AICC, FIRST, Phoenix, Sun Life, and Pacific Life are all **GRANTED** and all claims against these defendants are dismissed. Though it seems doubtful that Plaintiffs will be able to state a claim against these defendants, the

27

dismissal at this stage, except as to FIRST, is without prejudice. The Clerk is directed to set this matter on the Court's calendar for further scheduling as to the remaining parties.

      **SO ORDERED** this 17th day of June, 2013.

s/ William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court